UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| Francenia Griffey, | : Case No. 1:08-cv-786 |
| Plaintiff, | : |
| vs. | : |
| Michael J. Astrue, Commissioner of Social Security, | : |
| Defendant. | : |

**ORDER**

Plaintiff Francenia Griffey has filed objections to the Magistrate Judge's Report and Recommendation concerning Griffey's claim for Social Security Disability benefits. The Magistrate Judge recommends that the Court affirm the decision of the Commissioner denying Griffey's claim for benefits, because substantial evidence in the record supports that decision. (Doc. 12) The Magistrate Judge rejected all of Griffey's claims of error in the Commissioner's decision. Griffey now raises a single objection to that Report, arguing that she meets or equals the disability requirements based on mental retardation set forth in Social Security Listing 12.05(C). (Doc. 13)

**FACTUAL BACKGROUND**

Griffey applied for disability benefits in June 2003, originally alleging an onset date of November 28, 1995. (TR 82) She claimed she was unable to work after May 31, 2002 due to

learning difficulties, poor circulation, "corns on her feet," and high blood pressure. (TR 94) Griffey had been diagnosed with and received treatment for discoid lupus, a chronic skin condition that causes scarring and inflammation. Her primary care physician apparently referred her to a dermatologist, Dr. Ridge, in August 2002. (TR 234) An office note from Dr. Ridge dated May 20, 2005 notes that Griffey had not returned for a visit for almost three years because of change of insurance. Griffey had prominent discoid lupus of the scalp which had significantly progressed since her last visit. (TR 215) A January 26, 2006 office note by Nancy Hogan, a certified nurse practitioner affiliated with Dr. Ridge, describes lupus on Griffey's scalp, elbows and knee, with a scaling, crusty appearance. (TR 214) Griffey also has alopecia, which causes her hair to fall out. Griffey is also obese, and was treated by her primary care physician with Adipex and a recommended 1000 calorie diet. (TR 196-203)

In December 2003, Griffey complained to her family physician, Dr. George Kaiser, of low back pain after reporting that she fell in a grocery store. (TR 193) Kaiser prescribed Vicodin at that time. Griffey reported to Dr. Fritzhand (a state disability reviewer) in March 2006 that she was having lower back pain. Fritzhand's examination revealed no neurological deficits and Griffey demonstrated normal range of motion. (TR 166-169)

Her March 9, 2004 x-ray showed normal spinal alignment, no compression fractures, and a slight narrowing at L5-S1. (TR 170) An MRI ordered by Dr. Kaiser on May 30, 2006 revealed degenerative changes, with minimum disc bulge at L-5/S-1, L4-5, and asymmetric disc protrusion at L3-4. The report does not indicate any impression or diagnosis other than degenerative changes. (TR 244)

The record also contains a report of an emergency room visit on January 12, 2005, where Griffey complained of left buttock and leg pain diagnosed as sciatica. She was prescribed Flexeril and Motrin, and instructed to follow up with Dr. Kaiser. (TR 208-210)

In her January 2004 personal function report, Griffey described difficulties with reading and writing and described herself as a "slow learner." (TR 94) She graduated from high school in 1972. Griffey has held various jobs, including dietary aide, amusement park ride operator, restaurant worker, and machine operator in a paper factory. She stated that she left the last job because she could not read well enough to follow written instructions concerning the machines, and could not timely fill out required written reports. (TR 95) She has no difficulty with personal care, and she was able to clean, do laundry, iron, and cook meals every day. She went shopping every two weeks without assistance. She had trouble using a checkbook

because of her writing, reading and spelling deficits, but was able to pay bills, count change, and handle a savings account. (TR 114-117) She stated that when she had to read or write, she would cry. (TR 119)

In a subsequent May 13, 2004 claimant's statement, Griffey said that she was "getting worse - depression - gradual change." (TR 121) And by July 2004, Griffey reported that she needed help with chores that in January she could do herself (cleaning, laundry, and shopping). (TR 131)

Griffey was evaluated for mental impairments during the administrative process. She has never received treatment for any mental or emotional condition. Griffey saw Dr. Rosenthal, a psychologist, for an assessment on January 28, 2004. (TR 161-165) Griffey reported that she "feels sad because she can't read" but denied any other emotional problems. Her mental status was alert and oriented, with intelligence in the low range. Her global assessment of functioning score was 75, based on the severity of her symptoms and her current functional capacity. Dr. Rosenthal concluded that Griffey was able to understand and follow simple one or two step job instructions, as well as tolerate the stress of daily employment. He made no psychiatric diagnosis, and noted her hypertension and foot pain. (TR 164)

Dr. Goldsmith performed a functional capacity assessment in March 2004. The written referral to Dr. Goldsmith states that

Griffey was granted disability benefits in February 1996 for "MR (BIF) & ADHD" (mental retardation (borderline intellectual function) and attention deficit hyperactivity disorder), but that Griffey's current status reflects no ongoing disability. (TR 175) Dr. Goldsmith found Griffey was impaired by borderline intellectual functioning, but that she did not meet or equal the diagnostic criteria for mental retardation under Listing 12.05. (TR 180) He concluded she was mildly limited in activities of daily living, social function, and concentration, persistence or pace. (TR 186) Goldsmith found her to be moderately limited in three categories (ability to understand and remember detailed instructions, to carry out detailed instructions, and to respond to changes in the work setting). His written assessment notes that Griffey's description of herself as a "slow learner" is credible. Goldsmith also notes testing done in 1996, at which time her verbal IQ was 69 and her full-scale IQ was 70, with symptoms consistent with ADHD. Based on Griffey's own description of her activity level, Goldsmith concluded she was capable of a wide range of simple activities. (TR 191)

On September 16, 2006, Griffey was evaluated for the state by psychologist Dr. Nancy Schmidtgoessling. Griffey again denied any previous mental health treatment. Dr. Schmidtgoessling noted that Griffey was often confused, and seemed anxious and depressed throughout the interview. But she also described Griffey as

-5-

concrete and logical in her thoughts, and as cooperative and talkative. Griffey had difficulty understanding and following directions, and also had limited effort and persistence. Her WAIS-III scores were verbal IQ 52, performance IQ 52, and full scale IQ 48. Dr. Schmidtgoessling's report also notes that, because of Griffey's depression and great distress during the session, her scores are "probably somewhat of underestimates." (TR 239) Based on her prior IQ scores, Griffey likely had very low intellectual abilities. Dr. Schmidtgoessling did not diagnose mild mental retardation due to a lack of information about Griffey's childhood adaptive functioning. And she did not have enough information to clinically differentiate between mild mental retardation and borderline intellectual functioning.

According to Schmidtgoessling's functional assessment, Griffey had moderate impairments in the ability to carry out simple job instructions, to maintain concentration and attention, and in her ability to relate to co-workers and supervisors. Her ability to tolerate normal stress is severely impaired by her intellectual deficits and depression. Dr. Schmidtgoessling scored Griffey's global adaptive function at 45-50, indicating serious deficits.

The ALJ held an initial hearing on February 3, 2006, at which Griffey, her daughter, and a vocational expert testified. (TR 261-311) The hearing was adjourned because some of Griffey's

medical records were not in the administrative record. The hearing resumed on June 22, 2007. (TR 312-365) Griffey and her daughter testified again about her limitations. Due to the differences in the psychological evaluations and functional capacity assessments of Drs. Rosenthal, Goldsmith and Schmidtgoessling, the ALJ requested a third medical expert, Dr. Mary Buban, to review the records and testify at the hearing.

Dr. Buban noted the marked differences between Griffey's self-reporting to Rosenthal in 2004 and to Schmidtgoessling in 2006 about her functional abilities and aspects of her history, including prior treatment for substance abuse. Buban questioned Schmidtgoessling's diagnosis of major depression, something that no other physician or reviewer had diagnosed. Buban stated that the 1996 IQ test results put Griffey right on the cusp of borderline intellectual functioning, and discounted Schmidtgoessling's test results as understated and thus unreliable. Buban also questioned Schmidtgoessling's very low GAF score because she failed to explain how she arrived at that score, and what clinical or functional signs and symptoms it was based upon. Based upon her review of all of the records, Buban believed that Griffey had borderline intellectual functioning rather than mental retardation because of Griffey's largely unhindered adaptive functioning over most of her life. Therefore, Buban concluded that Griffey did not meet or equal

-7-

Listing 12.05 for mental retardation. Griffey's functional limitations included being limited to simple tasks; that any instructions to her must be verbal; and that she would not have to meet strict production standards or perform fast-paced work. (TR 351)

A second vocational expert, Eric Pruitt, testified at the 2007 hearing concerning available jobs that Griffey could perform given her functional limitations. Pruitt stated that Griffey could not perform her past relevant work and had no transferrable skills. Within the restrictions articulated by the ALJ, Griffey could perform light duty jobs, specifically including carton packaging machine operator (500 jobs regionally); printing machine operator (800 jobs regionally); buffing machine tender, 400 jobs regionally; and a cumulative number of regional, qualified light duty jobs of approximately 3,400. The ALJ asked Pruitt a question, adding a restriction of no exposure to irritating chemicals. Before Pruitt could answer, the parties went off the record of the proceedings. When they returned, Griffey's attorney stated: "Here's some more Kleenex. Thank you for the use of the Kleenex. ..." The hearing then terminated. (TR 365) There is no record of what, if any, response Pruitt gave to the ALJ's last question.

The ALJ's July 17, 2007 decision extensively reviewed the medical evidence and the hearing testimony and found that Griffey

was not disabled.  Griffey has several severe impairments, including borderline intellectual functioning, obesity, history of lupus, hypertension, spinal degenerative changes, and painful low back and foot syndrome.  He found that Griffey's borderline intellectual function impairment does not meet or equal Listing 12.05 for mental retardation, or any other applicable listing. Griffey argued that Dr. Schmidtgoessling's IQ test results confirmed her qualification for benefits, but the ALJ rejected those results because Schmidtgoessling herself believed them to be unreliable, especially in view of the significantly higher scores on Griffey's earlier testing.  Dr. Schmidtgoessling also did not make a diagnosis of mental retardation.

The ALJ then assessed Griffey's residual functional capacity, finding her capable of light work with additional limitations.  (TR 39)  Relying on the vocational expert's testimony that as many as 3,000 jobs exist in the region that Griffey would be capable of performing within those limitations, the ALJ concluded that Griffey was not disabled and not entitled to benefits.

After the Appeals Council denied her request for review, Griffey timely filed her complaint in this court.  She raised four objections to the Commissioner's decision: (1) the ALJ improperly rejected the opinions of her treating physicians; (2) the ALJ erred in concluding she did not meet Listing 12.05(C);

(3) the ALJ erroneously concluded that her pain complaints were not disabling; and (4) the ALJ failed to account for the vocational expert's testimony regarding Griffey's requirements for a clean air environment.

The Magistrate Judge rejected each of these arguments in his Report, recommending that this Court affirm the decision of the Commissioner. Griffey now lodges one objection to the Magistrate Judge's report, the failure to find that she meets or equals the requirements of Listing 12.05 for mental retardation. As Griffey has not objected to the Magistrate Judge's conclusions concerning her other three assignments of specific errors, this Court need not address them. See, e.g., <u>Crum v. Sullivan</u>, 921 F.2d 642, 645 (6th Cir. 1990), holding that claimant's failure to object to the Magistrate Judge's conclusions on her residual function capacity waived any further appeal of those conclusions.

## DISCUSSION

Under 42 U.S.C. §405(g), this Court reviews the Commissioner's decision by determining whether the record as a whole contains substantial evidence to support that decision. "Substantial evidence means more than a mere scintilla of evidence, such as evidence a reasonable mind might accept as adequate to support a conclusion." <u>LeMaster v. Secretary of Health and Human Serv.</u>, 802 F.2d 839, 840 (6th Cir. 1986) (internal citation omitted). The evidence must do more than

-10-

create a suspicion of the existence of the fact to be established. Rather, the evidence must be enough to withstand a motion for a directed verdict when the conclusion sought to be drawn from that evidence is one of fact for the jury. Id.

If the ALJ's decision is supported by substantial evidence, the Court must affirm that decision even if it would have arrived at a different conclusion based on the same evidence. Elkins v. Secretary of Health and Human Serv., 658 F.2d 437, 438 (6th Cir. 1981). The district court reviews de novo a magistrate judge's report and recommendation regarding Social Security benefits claims. Ivy v. Secretary of Health & Human Serv., 976 F.2d 288, 289-90 (6th Cir. 1992).

Listing 12.05 of the disability regulations defines disabling mental retardation as "... significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22." (20 C.F.R. Part 404, Subpart P, Appendix 1 at 12.00A). To meet the requirements of Listing 12.05, a claimant must satisfy this description as well as meet the requirements of one of the listing's subsections A through D. Griffey argues she meets subsection C, "A valid, verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant

work-related limitation of function."

The ALJ concluded that Griffey failed to meet the requirements of the Listing because Dr. Schmidtgoessling's IQ test results were not reliable; because she did not diagnose mental retardation; and because Griffey's level of adaptive functioning did not indicate retardation. Griffey was able to work in competitive employment and she graduated from high school. (TR 31) The Magistrate Judge agreed with this conclusion, noting that the diagnostic criteria of Listing 12.05 mirror the diagnostic criteria for mental retardation. He cited Cooper v. Commissioner of Soc. Sec., 217 Fed. Appx. 450, 207 U.S. App. LEXIS 3599(6th Cir., Feb. 15, 2007), holding that a claimant must satisfy the initial diagnostic criteria for mental retardation **and** demonstrate an IQ score within the Listing's defined range in order to qualify under the Listing. None of the psychologists or physicians who treated or evaluated Griffey diagnosed her as mentally retarded. Given the questionable validity of the 2006 IQ tests, Griffey did not satisfy her burden of demonstrating that she met or equaled the requirements of Listing 12.05.

Griffey objects, stating that she qualified for disability benefits in 1996 based on a diagnosis of borderline intellectual functioning and ADHD. Dr. Heideman examined Griffey at that time and diagnosed mild mental retardation, with a full scale IQ of

70.  These test results are not in the record, but Dr. Buban reviewed them and described them in her testimony.  Buban said the 1996 results were verbal 69, full scale 70 and performance 74, putting Griffey "on the cusp for borderline intellectual functioning."  Buban states that Dr. Heideman diagnosed mild mental retardation because of Griffey's verbal score of 69.  But according to Buban, the balance of Heideman's observations were that Griffey was "well adjusted emotionally and showed considerable positive affect."  She had some difficulty in following instructions, but Heideman felt she would be able to relate to fellow workers and supervisors.  He also felt Griffey's ability to withstand job stress was not limited for any psychological reason, as she was "largely emotionally stable." (TR 346-348)

   The Magistrate Judge correctly concluded that Griffey must satisfy both the diagnostic criteria in Listing 12.05's introductory paragraph and one of its four subsections.  <u>Foster v. Halter</u>, 279 F.3d 348, 354 (6th Cir. 2001).  Griffey argues that IQ scores generally remain constant throughout a person's life, and so her 2006 tests should be read together with the 1996 tests.  All of her scores demonstrate that she falls within the requirements of Listing 12.05(C).  The Court disagrees.  As both the ALJ and the Magistrate Judge noted, Dr. Schmidtgoessling believed the 2006 scores were very likely unreliable and

understated Griffey's abilities.  The Listing plainly requires a **valid** IQ test result.  The wide discrepancy between the two tests given ten years apart is further evidence of the questionable validity of the later tests.  If valid IQ results tend to remain stable as Griffey suggests, she does not offer any explanation that contradicts Dr. Schmidtgoessling's doubts about her 2006 scores.

In this regard, the Court notes that the ALJ questioned Griffey's credibility in describing her subjective complaints, and the discrepancy in her self-reports of her functional capacity.  (TR 33-35) For example, at the second 2007 hearing, Griffey acted as if she could not understand the meaning of even simple questions addressed to her, which the ALJ found to be inconsistent with her behavior during the first hearing.  Griffey also complained about adverse side effects from her medication, yet consistently denied such side effects to her treating physicians.  Among Dr. Schmidtgoessling's observations of Griffey was her impression that Griffey put forth limited effort in the tests, but was also concrete and logical in her thoughts.

Moreover, Griffey does not address the lack of evidence in the record establishing her "deficits in adaptive functioning before age 22," as is required by the diagnostic criteria for Listing 12.05.  Griffey testified that she was a slow learner, that she received special education classes, and there is

-14-

evidence that she missed a number of school days (apparently to care for a sibling). She argues that her school records demonstrate her "very low intellectual abilities." But this is insufficient to satisfy the Listing. Griffey does not dispute the fact that she graduated from high school. She has previously held a number of responsible jobs. In Foster v. Halter, the Sixth Circuit affirmed the denial of benefits to the claimant whose full scale IQ scores were 69 and 68 on successive tests, because the claimant failed to show her adaptive deficits prior to age 22. The claimant had dropped out of school after the ninth grade but the reasons for that were not clear. The claimant had also worked as an accounting clerk at a bank and as a liquor store clerk before injuring her leg (which eventually led to her claim for disability benefits). The Sixth Circuit found this evidence failed to establish an early onset of deficits of adaptive functioning.

The same conclusion applies here. Griffey actually graduated from high school, and she has held several responsible jobs. While her intellectual function may indeed be borderline, as all of the medical experts concluded, that does not suffice to meet or equal the requirements of Listing 12.05.

## CONCLUSION

For the reasons stated, Plaintiff's objection to the Magistrate Judge's Report and Recommendation are overruled. The

Court has reviewed the record de novo, and hereby adopts the Magistrate Judge's Report and Recommendation in full.  The Court affirms the decision of the Commissioner that Plaintiff is not entitled to an award of disability benefits.

    SO ORDERED.

    THIS CASE IS CLOSED.

DATED: December 1, 2009        <u>s/Sandra S. Beckwith</u>
                                       Sandra S. Beckwith
                                       Senior United States District Judge